## Kenyon *versus* Ashbridge.

Where a will is impeached on the ground of fraud practised by the defendant, claiming under it adversely to the testator's daughter and heir at law, whose legitimacy is disputed; evidence is admissible of the declarations of the testator, that he had made a former will in favour of his daughter; and that, on this being communicated to the defendant, she said, she had got possession of that will, and meant to destroy it.

Where it was shown, that the defendant and the testator (her brother) were not on good terms; that she had to be looked for for three days, before she could be brought to his sick-bed; that when she came, her presence was a distress to him; that he was sinking with a malady that involved his brain; that she took possession of him and his house, destroyed the will he had made, and procured another to be executed after he was speechless, and that, a will in her favour which contradicted all the declarations of his life; all her acts and declarations in the premises, became relevant and important, as part of the *res gestæ*, bearing on the question of fraud in procuring the will, under which she claimed to disinherit the testator's daughter and heir at law.

The declarations of the testator, that he had made a will in favour of his daughter, are evidence on the question of her legitimacy.

To establish marriage in civil cases, other than actions for seduction, the declarations and conduct of the parties are competent evidence.

CERTIFICATE from the Court of *Nisi Prius.*

This was an ejectment by Emma M. Kenyon against Mary Ashbridge, for a house and lot of ground, on the north side of Pine street, between Sixth and Seventh streets, in the city of Philadelphia.

Both parties claimed title under Captain Henry Kenyon, who died seised of the premises, some time between the 12th August and 17th October 1833. The plaintiff claimed title as his daughter and heir at law; the defendant, under a will and codicil, alleged to have been executed by him, on the 7th and 12th August 1833, respectively, and which were admitted to probate on the 17th October in the same year. The defendant disputed the legitimacy of the plaintiff.

About six months previously to his death, Captain Kenyon went to board with Mrs. Mary Jennings. Although apparently in good health, he frequently complained of headache, from a fall received on board of a vessel; and in a short time, a tumor commenced growing on his forehead. Dr. Thomas Harris, a surgeon in the United States navy, performed an operation for the removal of this tumor, and pronounced it to be "a tumor on the membrane that surrounds the brain;" he found that it had originated on the *dura mater*, and by pressure caused an absorption of the bone; he laid open the scalp, and dissected the tumor from the *dura mater*. Captain Kenyon was very ill from the effects of the operation for some weeks.

At this juncture, Mrs. Jennings, knowing that he had a sister

[Kenyon *v.* Ashbridge.]

(Mrs. Ashbridge, the defendant), named it to him, and asked to have her sent for. He refused to have her sent for, and told Mrs. Jennings if she did not want to have his displeasure, never to mention her name again. He said, she was no sister of his; that she had acted in such a manner that he did not wish to see her; that he never wished to see her, and that she should never be anything the better for him or his property.

He had partially recovered, when, about three weeks after the operation, he fell in an apoplectic fit; from which time to his death, he remained speechless. After this, Mrs. Ashbridge, the defendant, was sent for; when she came, she was anxious to have a will made. Captain Kenyon appeared to be distressed at her presence. Mrs. Jennings informed her, the captain had made his will, or at least that he had told her so. The defendant was very anxious to find the will, but Mrs. Jennings kept the keys, and would not allow her to have them. Mrs. Jennings testified, " One day she told me, she had found the will in a book in the closet, where she little thought to find it; she had it in her bosom. I asked her to let me see it. She said, ' no, she would let no one see it.' I asked her, who he had left his property to? She said, ' not to them he ought to have left it to; and that she was going to destroy it.' It was in her bosom, she said, and she was going to destroy it." To another witness the defendant said, " I have found the will; I have got it in my bosom."

The defendant subsequently had the alleged will and codicil drawn up and executed, under which she claimed the property. She then obtained the testator's keys from Mrs. Jennings, and shortly afterwards had him removed, with all his effects, to his house in Pine street, where he died.

The plaintiff, then a little girl, visited her father during his sickness. He had frequently acknowledged her as his daughter; and spoken of her mother as his wife. There had been a separation between them; but he retained and supported this child. He said, that he had made his will, and left his property to his daughter; but that in case of accident, he had named two of his nephews in England, for that his sister, or her children, should never have anything belonging to him.

On the trial, the defendant excepted to the admission of evidence that Mrs. Jennings informed the defendant, that the captain had made his will, and her declaration that she had got possession of it, and intended to destroy it; and also to the admission in evidence of the declarations of Capt. Kenyon, that he had made his will in favour of his daughter.

The court below (THOMPSON, J.), in answer to points presented by the plaintiff and defendant, instructed the jury as follows:—

" A will cannot be established by proving the declarations of the alleged testator that he had made a will, for this would have

[Kenyon v. Ashbridge.]

the effect of nullifying the statute, which requires it to be in writing, and signed by the testator, in the presence of two competent witnesses.

"In the case before you, we instruct you that, if you believe the witnesses, Mrs. Jennings and Mrs. Atkinson, that Captain Kenyon declared to them that he had made his will, and if this declaration was made known to Mrs. Ashbridge, and she afterwards declared she had found it, stating the place where she found it, and declared she had it then in her bosom, and refused to show it, declaring her intention to destroy it, or burn it; that the property was not left 'to them that he ought to have left it to;' and that the will has never since been seen or produced; you may presume, from these facts, that Captain Kenyon had made a legal will, and you may presume that she destroyed it in accordance with her declared intent, and that it devised the property in question contrary to her interests. The presumption *in odium spoliatoris* may arise against her to this extent, in the absence of evidence to explain her conduct, and her neglect or refusal to produce the will. The presumption rests upon the philosophy of actuating or impelling motives, and attributes self-interest as the motive for such an act. These declarations of the testator, and admissions of the existence and possession of the will by the defendant, if you believe the testimony, prove the existence of the will; but cannot be set up to enable the plaintiff to recover upon it, for its contents are no otherwise proved than by the declarations of the testator, and this is insufficient; the contents should have been shown by other testimony. The plaintiff cannot recover on it. But the presumption arising from the fact of the destruction of the will is evidence, to be considered in connection with acts of the defendant in the alleged procurement of the will to be made, under which she claims to hold the property. You will consider these acts, and the presumptions arising from them, when you come to consider the validity of that will in connection with the other evidence in the case on that subject."

To this charge the defendant excepted. The jury found in favour of the plaintiff, as follows: "That Emma M. Kenyon is the heir at law, and that Captain Kenyon was not *compos mentis*, when he made his will dated August 7th 1833, and codicil dated August 12th 1833." Judgment having been entered on the verdict, the defendant removed the cause to this court, and here assigned for error: 1. The admission of the evidence contained in her bill of exceptions: 2. The charge of the court.

*Fallon & Serrell*, and *W. A. Porter*, for the plaintiff in error, cited Clark v. Morton, 5 *Rawle* 235; Reynolds v. Reynolds, 16 *S. & R.* 82; Jackson v. Kniffin, 2 *Johns.* 31; Smith v. Fenner, 1 *Gallison* 170; Stevens v. Vancleve, 4 *Wash. C. C.* 266; Collins

[Kenyon *v.* Ashbridge.]

*v.* Elliott, 1 *Har. & Johns.* 1; Moritz *v.* Brough, 16 *S. & R.* 403;
Provis *v.* Reed, 5 *Bing.* 435; 3 *Moore & Payne* 4; Shallcross *v.*
Palmer, 71 *Eng. Com. L.* 747; Rambler *v.* Tryon, 7 *S. & R.* 90;
Betts *v.* Jackson, 6 *Wend.* 173; Dan *v.* Brown, 4 *Cowen* 488;
Comstock *v.* Hadlyme, 8 *Conn.* 254; Reed *v.* Harris, 7 *C. & P.*
330; Parkes *v.* Parkes, 2 *Barn. & Ald.* 489.

*David Paul Brown* and *A. M. Burton*, for the defendants in
error, cited Allen *v.* Public Administrator, 1 *Bradford* 378; Betts
*v.* Jackson, 6 *Wend.* 188; Young *v.* Holmes, 1 *Strange* 70;
Jackson *v.* McVey, 18 *Johns.* 330; 1 *Starkie Ev.* 69; Berkeley
Peerage Case, 4 *Camp.* 416.

The opinion of the court was delivered by

WOODWARD, J.—The two questions that arose upon the trial of
this cause are well stated by the plaintiff in error: 1st. Was the
will of 1833 valid? and if it was not, then, 2d. Was the plaintiff
below the legitimate heir of Captain Kenyon?

And the first of these questions is represented as embracing
two points: 1st. Fraud practised by the defendant: and 2d. The
incompetency of the testator.

There was evidence on both sides as to the competency of Cap-
tain Kenyon to make a will, none of which, and no instructions
respecting which, are complained of; but the declarations of the
testator that he had made a former will in favour of his daughter,
and the declarations of Mrs. Ashbridge that she had got posses-
sion of that will, and meant to destroy it, and the observations of
the judge on that evidence, are the matters assigned for error.

The declarations of Captain Kenyon were evidence on the
second question stated, the legitimacy of the plaintiff. She was
legitimate if the captain were the husband of her mother, and to
establish marriage in civil cases, other than actions for seduction,
declarations and conduct of parties are always admitted. Mr.
Greenleaf tells us, vol. 2, § 462, on the authority of several cases,
English and American, that the inference of marriage of persons
may be drawn from the baptism, acknowledgment, and treatment
of their children by them as legitimate. And again, in vol. 1,
§ 106, that family conduct, such as the tacit recognition of rela-
tionship, and the disposition and devolution of property, is admis-
sible evidence of pedigree; and he quotes Chief Justice MANS-
FIELD in the Berkeley Peerage Case, 4 *Camp.* 416, that if the
father is proved to have brought up the party as his legitimate
son, this amounts to a daily assertion that the son is legitimate.

Captain Kenyon's uniform treatment and recognition of Matilda
as his daughter, and his declaration that he had made his will in
her favour, were facts that she could not properly be deprived of,
in a case where her legitimacy was questioned.

[Kenyon *v.* Ashbridge.]

But his declaration was evidence also, as bearing on the alleged fraud of Mrs. Ashbridge, in procuring him to make a second will in her favour. It was communicated to her, and in connection with her answer, it became evidence against her, if relevant to the issue. And was it not relevant to an issue of fraud, to show by her own confession, that she had got possession of the former will, and meant to destroy it? She did not allege that she had got the possession with her brother's knowledge or consent, but she had " found the will in a book in the closet, where she little thought to find it. She had it in her bosom. I asked her (said the witness) to let me see it. She said, no, she would let no one see it. I asked her who he had left his property to, she said not to them he ought to have left it to, and that she was going to destroy it."

This evidence was not put to the jury as proving the contents of the former will, nor as establishing it as ground for the plaintiff's recovery; on the contrary, the learned judge told the jury expressly that the former will could not be set up to enable the plaintiff to recover upon it; but it was part of the *res gestæ*, and as such properly admitted. It was not for this good lady, after such declarations, to deny the existence of the former will. Nor would it have been proper for the court to exclude from the jury a knowledge of the liberties she was taking with it, for they might think that the suppression of that will had something to do with the production of a will just after, by which all her brother's estate was devised to her.

When it is considered that she and her brother were not on good terms—that she had to be looked for three days before she could be brought to his sick-bed—that, when she came, her presence was a distress to him—that he was sinking with a malady that involved his brain—that she took possession of him and his house, destroyed the will he had made, and procured another to be executed after he was speechless,—and that, a will in her favour which contradicted all the declarations of his life—when such a case was presented for the consideration of a jury, all her acts and declarations in the premises and about the matter, become relevant and important evidence, as bearing on the question of whether the second will was indeed the will of Captain Kenyon, or a mere fabrication of her own.

In questions of fraud great latitude of proof is always allowed, but this evidence was competent on the strictest principles of the *res gestæ*. How is a party charged with fraud to be tried, if not by her acts and declarations about the subject-matter? It was not the purpose of this evidence to affect Mrs. Ashbridge, as spoliator, with the contents of the former will. That instrument, for all purposes of the plaintiff's title, was out of the question. If the plaintiff was not the legitimate daughter of Captain Kenyon, she could not recover; and if she were, she could recover only

[Kenyon *v.* Ashbridge.]

because the last will was void, and the law cast the inheritance upon her—not because the former will was established. The trial was not, therefore, between two wills, but between a descent cast and an alleged will. The impeachment of the latter was the great point of the cause, and the evidence objected to was admitted as bearing on that point. What was said and done about the former will, was part of the *res gestæ*, and served to throw light on the competency of the testator, and the character of the testamentary act under which the defendant claimed.

Nor was the evidence improperly discussed by the judge. He did not give it any binding effect, but he told the jury they might presume from it the existence of the former will. Surely, such a presumption might safely have been adopted by either court or jury, if the witness was believed who proved Mrs. Ashbridge's declarations. But the fact, presumptively established, that there was a former will, weighed heavily in the balance against the will set up by Mrs. Ashbridge. The heir at law was entitled to the benefit of the fact. She got no more than was her due, and she got that according to law.

The judgment is accordingly affirmed.